THE OLD TIME PETROLEUM COMPANY, a corporation of the State of Delaware,

vs.

BATTISTA TURCOL and JENNIE TURCOL, his wife.

*New Castle, July 29, 1931.*

*William S. Potter,* of the firm of Ward & Gray, for complainant.

*William Prickett,* for defendants.

THE CHANCELLOR: A great âmount of argument has been had in this case concerning the sufficiency of the notices sent in behalf of the complainant by which it undertook to avail itself of the option agreement in the lease. The argument turns on whether the provision was complied with found in clause "g" reading as follows: "Provided that the said lessee give notice in writing at least sixty days prior to date said lessee wishes to purchase the said premises."

In applying this proviso to the notices, the defendant concedes that sixty days intervened between the time of the serving of the first notice (March 19) and the date named therein for the purchase (May 21). He objects however to the sufficiency of that notice because it named May 21 as the date for the purchase. That date, argues the solicitor for the defendant, was a date after the lease would expire, and inasmuch as the option was to purchase "while the said lessee is a tenant," it is apparent that the complainant was outside the right conferred by the option when it undertook to become a purchaser after the tenancy would have ceased.

This contention is not acceptable. On March 19, when the notice was given, the complainant was a tenant of a term which was to end, not on the then ensuing May 20, as the argument assumes. There having been no three months' notice given by either party, the tenancy continued for another year, that is to say, to May 20, 1931. *Revised Code* 1915, § 4535, as amended by 36 *Del. Laws, c.* 271, § 2; *Hirzel, et al., v. Silker,* 34 *Del. Rep.* (4 *W. W. H.*) 588, 156 *A.* 360, decided by the Supreme Court of this State. Whether the subsequent attempt of the landlord to forfeit the lease on April 26 can be allowed the effect of terminating it on that day, will be presently considered, and answered in the negative.

So that the life of the lease continued until May 20, 1931. Hence the date of May 21, 1930, which the complainant named as the date it would purchase, was not a date

occurring after the complainant would have ceased to be a tenant. Granting then, without deciding, that the phrase in the option clause—"while the said lessee is a tenant"— is to be given the strict meaning which the defendants contend for, it thus appears that there is no situation of fact which makes the interpretation pertinent.

The reference in the notice to clause "d" of the lease as being the option clause under which the complainant was serving the notice, was erroneous. The clause was not "d" but "g." That, however, is of no moment. The notice referred to the lease and the option therein contained. A mistaken designation of the clause's letter could not possibly mislead.

The complainant, therefore, by its first attempt gave a good and sufficient notice of its exercise of the option and fixed a time, viz., May 21, 1930, as the date of purchase, a date when the relations of landlord and tenant would be continuing. The complainant made actual tender of twelve thousand dollars a day in advance of that date. The landlord made and now makes no complaint that the tender was a day in advance. There would be no merit in such a complaint. His refusal to comply was based, I assume, on what his contentions reveal as his justification, namely, that the lease had expired and, if not, yet the stipulated sum of twelve thousand dollars was, under the circumstances, too little.

The views hereinabove expressed regarding the first notice render it unnecessary to consider the sufficiency of the two later notices which were sent out of an abundance of precaution. I therefore refrain from entering upon an examination of the proper rule to apply in counting the sixty day period provided for in the option as necessary to intervene between the giving of the notice and the time of purchase.

It is likewise unnecessary, in view of the sufficiency of the first notice, to decide another point to which the solici-

tors addressed their arguments, namely, did the option clause contemplate that only the notice need be given during the tenancy, or did it also contemplate that the purchase, after the sixty day notice, had to be made during the tenancy?

A moment or so ago it was stated that the attempted forfeiture of the lease by the landlord so as to terminate it on April 26, was ineffective. I now address myself to showing the reasons which lead me to that conclusion.

The landlord's attempt to declare a forfeiture rests upon the proposition that the lease calls for monthly installments of rental payable in advance. If the lease so provides, the tenant breached the covenant in that behalf, and the landlord contends that under paragraph "e" he thereupon had the option to declare the forfeiture.

When was the rent payable? The lease calls for monthly payments of one hundred and thirty-five dollars, and specifically provides that the first payment shall be made on May 20, 1925, the date when the tenancy commenced. Thus, the first installment was payable in advance. Nothing is said in the lease about later installments. The only other reference is found in paragraph "a," where it is provided that the lessee "will without demand therefor, pay the said specified rents at the time and in the manner above provided," and upon his failure the landlord may enter and re-let as the tenant's agent, collecting the rent. This reference throws no light on whether the rent was payable at the beginning or at the end of each month after the first. It refers us for all information back to what had been before set out in the lease; and, as to what is found there, I have already stated that while the first installment is made payable in advance, no express provision is made for the due dates of the subsequent ones.

If the installments were intended to be made payable in advance, it is so only by implication. The question is one of construction of the lease. In construing a deed contain-

ing restrictions, the rule is that the language of restriction is to be construed most strictly against the grantor. *Gibson, et ux., v. Main,* 14 *Del. Ch.* 449, 129 *A.* 259, affirming *Id.,* 14 *Del. Ch.* 112, 122 *A.* 188. Conditions in a deed which upon a breach work a forfeiture of the estate are not favored in law. *Board of Public Education v. St. Patrick's Roman Catholic Church,* 15 *Del. Ch.* 286, 136 *A.* 833. Indeed it may be said generally with respect to forfeitures that they are not favored by the law, and conditions which undertake to create them must be free from abiguity, uncertainty or doubt. *Dover Glass Works Co. v. American Fire Ins. Co.,* 1 *Marv.* (*Del*) 32, 47, 29 *A.* 1039, 65 *Am. St. Rep.* 264. There is no distinction to be drawn between a deed and a lease for a term in applying the rule of construction, that where the language is uncertain, the grantee or the lessee should be favored by a liberality of construction in his favor. 16 *R. C. L., pp.* 699, 700. This rule rests on the principle that the party having the power to stipulate in his own favor should not neglect to make his exactions clear and further "that every man's grant is to be taken most strongly against himself." *Ibid.* 700. The disfavor in which forfeitures are viewed gives a special reason for invoking this general rule of construction against the person whose granting language is appealed to as the source of a claimed forfeiture.

Applying these general principles to the case in hand, I conclude that inasmuch as the lessor in the lease left the matter of the time when monthly payments after the first should be made, whether in advance or at the end of the month, at best to implication, and omitted to make it clear beyond all doubt that all were to be made in advance, it would be an indulgence in favor of forfeiture which the law does not countenance for the court to say that the language used should be taken in its implied sense and, when so taken, made to supply the basis for the forfeiture claimed.

But even if the language were given such a liberality of interpretation in favor of a right to declare a forfeiture, yet it would be highly inequitable to allow the forfeiture to

operate in this case. In the first place the conduct of these parties prior to when the complainant gave notice that it proposed to exercise its option to purchase, shows that great and somewhat continuous indulgence had been shown the tenant in the matter of rental payments. The tenant was in arrears on numerous occasions without regard to whether the due date was the first or the last of the month, and no threat or warning of a forfeiture was ever so much as intimated by the landlord. Assuming that the tenant was in default for not paying the March rent in advance on the twentieth and was therefore liable to a declaration of forfeiture, it is significant that the landlord made no move in that direction until April 18, following. I suspect that the delay is explained by the fact that the landlord did not realize till then 'that he might have a chance to get rid of the option through the means of a forfeiture. Another significant circumstance connected with the declaration of forfeiture on April 18 is that the landlord's notice to vacate on April 26 gave no specification of reason. He simply notified the tenant to get out on that day, and left the tenant to speculate upon the reasons why.

From these circumstances above detailed, I am convinced that the forfeiture was not in the interest of vindicating the landlord's right to receive rent, which presumably the forfeiture clause was designed to safeguard, but solely in the interest of destroying the tenant's right to enjoy the option privilege to purchase which the tenant had previously advised the landlord he proposed to exercise.

The case seems to me to be one in which, under its peculiar circumstances, the defendant should not be permitted to avail himself of the advantages which a forfeiture would give him.

The complainant should therefore have a decree for a deed.

But it should not receive the deed by paying only twelve thousand dollars, the stipulated price.

I shall now turn to that branch of the case which deals with the consideration the complainant should pay.

It is a general rule that courts of equity will not decree specific performance of a contract that is an inequitable one. The discretionary nature of the remedy of specific performance is invariably administered in favor of the defendant's protection when the contract is such that "either from gross inadequacy of consideration or inequality of terms, such as shocks the common sense of justice, or from anything in the relations of the parties or in the circumstances of the contract, it is [would be] unconscientious for a party to exact his advantage." *Godwin v. Collins*, 3 *Del. Ch.* 189, 201.

In the case *sub judice* we are concerned with the question of unfairness only as respects consideration. The consideration named in the lease is twelve thousand dollars. There is no contention to the effect that that was not a perfectly fair consideration as of the time when it was agreed upon. It is contended, however, that subsequent events have been such as to render it grossly unfair, in that improvements and repairs have, since the lease was executed, been put on the property for which the landlord has paid about three thousand dollars, and that it would be inequitable to require the landlord to convey the property to the complainant without his being compensated for the benefits thus added by him to it.

There are cases to the effect that if an owner under an option contract to sell at a stipulated price, expends money by way of improvements, the optionee will be denied a decree for specific performance unless he reimburses the owner for the money laid out on the improvements. *Mentlikowski v. Wisniewski*, 173 *Mich.* 642, 139 *N. W.* 874; *Leeds v. Penrose*, 44 *N. J. Eq.* 464, 15 *A.* 261; *Lidikevicz v. Kopala, et al.*, 315 *Ill.* 404, 146 *N. E.* 461. Whether these cases are expressive of the correct rule, is doubtful. In 5 *Pomeroy's Equity Jurisprudence*, (2d Ed.) § 2221, is

found an expression which seems to be at variance with those cases. It is—"where the hardship arises from defendant's own act, after the bargain, he cannot complain of the results of his own conduct." To the same effect see *Fry on Specific Performance*, (*6th Ed.*) § 426.

Perhaps the best statement of the law on this subject is to be found in 5 *Pomeroy's Equity Jurisprudence*, (*2d Ed.*) §§ 2219, 2220, as follows:

> "Courts of equity frequently state the rule to be that the hardship and unfairness must be judged of in relation to the time of the making the contract and that specific performance will not be refused because of hard conditions brought about by subsequent events or changes in circumstances. A more accurate formulation of the rule is this: Equity will not relieve against hardship arising from a change in circumstances or the result of subsequent events, where these should have been in contemplation by the parties as possible contingencies, when they entered upon the agreement. * * *

> "* * * Illustration of such events may be found in cases where after the contract has been made, costly street improvements are ordered by the City which enhance the value of the land, but fall as a burden upon the vendor, and equity will not give the vendee the land unless he will assume the cost of the assessments."

Now in the instant case the question of fact is as to whether the expenditures on the property were made by the defendant of his own choice. Carvell testifies that they were in that the defendant authorized Carvell as his agent to secure the work to be done. The defendant denies that he ever constituted Carvell his agent in that respect. The issue of fact raised by this assertion and denial lay at the bottom of the contractor's suit against the defendant in the mechanic's lien proceedings, for if Carvell was not shown to be the defendant's agent, the contractor was not entitled to his lien.

After hearing witnesses upon the point of agency, the jury in the mechanic's lien suit brought in a verdict against the defendant for $3111.69. Thus the jury necessarily found as a fact that the repairs and improvements were authorized by the defendant.

The jury's verdict adjudicated the fact of Carvell's agency against Turcol. But the issue was *res adjudicata* against Turcol only in favor of the contractor. The complainant was not a party to the proceedings before the jury. Accordingly the defendant is as free in the instant case to litigate the question of Carvell's agency to act in his behalf as though it had never been heard before.

I must therefore decide the question of whether Carvell's act in engaging the contractor to do the work was authorized by Turcol solely in the light of the evidence before me. On the showing made by the evidence here, I am forced to conclude that Turcol never gave Carvell authority to have the work done. This conclusion is diametrically opposed to what the jury necessarily found in the mechanic's lien suit. I naturally feel some reluctance in announcing a conclusion upon a question of fact at variance with the judgment of a jury upon the same fact. Even, however, if the matter had been referred to the jury by the Chancellor on an issue framed, its finding would not be binding on the Chancellor. *Scotten, et al., v. Wright, et al.,* 14 *Del. Ch.* 124, 122 *A.* 541. I feel less than ordinary reluctance in declining to follow the jury's finding of fact in the mechanic's lien case as controlling on my views of the same question in this one, because I am persuaded that there are some features of the case appearing here which were not shown to the jury and which had they been so shown might have produced a different result.

I cannot take the time to discuss in detail the evidence upon the question of whether Turcol authorized Carvell to have the work done. The weight of the evidence is against the authorization; and the probabilities make it absurd, if Turcol is to be granted even only a modest sense of business prudence. Why should Turcol have given Carvell *carte blanche* authority to incur "repair" bills without limit and which in the sequel turned out to amount to over three thousand dollars? There was no obligation imposed by the lease on Turcol to make repairs. He was therefore under

no duty to make them. *Leech v. Husbands,* 34 *Del. Rep.* (4 *W. W. H.*) 362, 152 *A.* 729; 16 *R. C. L.* 1030; 36 *C. J.* 125. The folly of Turcol's being willing to spend so much money on the property is self-evident when it is remembered that the tenant had an option to take the title on sixty days' notice the moment the work was completed. Carvell says he was authorized to make the repairs and pay therefor out of the rent. But he could end the rent payments in two months by having his company, the complainant, exercise the option. Even if he did not, it would require all the rent for the balance of the term to pay for the work. If Turcol agreed to any such proposition he was rather abnormally dull. I am bound to say I do not believe that he agreed to it. Even were the probabilities not so convincing, I should nevertheless be persuaded by the testimony of the witnesses, Evans and Jackson, that Turcol's statement of the facts should be accepted.

The expenses to which Turcol was put for the repairs and improvements were forced upon him against his will. He paid them under the compulsion of a judgment which, whatever may have been the cogency of the evidence before the jury as justifying it, cannot, in the light of the evidence here, be taken as showing that the expenditures were authorized by Turcol.

I therefore regard Turcol's laying out of money for the repairs and improvements as involuntary on his part. It was as much an unforeseen burden as would be the cost of street improvements, etc., assessed by the municipality in which the property is located. Under the principle stated in *Section* 2219 of *Pomeroy,* quoted *supra,* and found applied in *King v. Rabb,* 123 *Iowa,* 632, 99 *N. W.* 306, and *Nelson v. Robinson,* 189 *Iowa,* 1076, 178 *N. W.* 416, where the vendor was relieved of the hardship of bearing the cost of municipal assessments imposed subsequently to the contract's date and thrown upon the vendee as a condition for granting him the relief of specific performance, I conclude that the burden of the repairs and improvements should be borne

not by Turcol but by the complainant, if the sale is decreed to be made.

Should the complainant be given a decree for a deed on condition that it reimburse Turcol, or should it be denied relief altogether? The reason for asking this question is that the complainant, by its president, was responsible for Turcol's being forced, through the instrumentality of the contractor's suit, to expend the money for the repairs and improvements. Notwithstanding this fact, I am of the opinion that under all the circumstances Turcol should be required to keep his contract provided he is fully compensated.

Without pausing to give my reason therefor, I conclude that the defendants should be decreed to convey the property as stipulated. But the complainant should, as a condition to its right to receive a deed, deposit in the Registry of this court on or before a designated day, the consideration therefor.

The settlement between the parties should be adjusted so as to place them "as far as possible in the same position which they would have occupied had the agreement been completed at the prescribed day, and to that end (the court) will allow to the purchaser the rents and profits, and to the vendor interest upon the purchase price from and after that date." *Pomeroy, Specific Performance,* (3d Ed.) § 429.

Applying this principle, the consideration which the complainant should pay into the Registry is to be calculated as follows:

The twelve thousand dollars stipulated should be paid in, with interest to date from May 21, 1930. *Noyes v. Bragg,* 220 *Mass.* 107, 107 *N. E.* 669. The complainant is not to be saddled with both rent and interest. *Sweeney v. Brow,* 40 *R. I.* 281, 100 *A.* 593; *Crossland v. Hart,* (*Tex. Civ. App.*) 234 *S. W.* 558; *Altoona Trust Co. v. Ison, et al.,* 171 *Ky.* 217, 188 *S. W.* 344. There should also be paid $2,928.12, the amount which Turcol was compelled to pay in order to

satisfy the mechanic's lien. Because of the complainant's part in creating the situation which necessitated that expenditure, it should pay six per cent. interest thereon from the date of Turcol's settlement with the contractor.

Furthermore, again adjusting the equities as of the time when the contract should have been carried out, the complainant should reimburse Turcol for such carrying charges as taxes, insurance and water rent. *Seven Mile Beach Co. v. Dolley*, 71 *N. J. Eq.* 735, 65 *A.* 991, 66 *A.* 191; *St. John the Baptist Greek Catholic Church v. Baron*, (*N. J. Ch.*) 73 *A.* 422; *Nowicki v. Kopelczak*, 195 *Mich.* 678, 162 *N. W.* 266. These are items which, considering the contract as performed on May 21, 1930, were chargeable to the compainant. Interest should be allowed on them. Turcol also claims that he should be reimbursed the amount of interest money on a mortgage which is a lien on the property. I do not think so. The interest he receives from the decree takes care of the interest he has paid.

If the complainant pays into the Registry of the court the sum so ascertained on the day designated in the decree, less any outstanding liens, the defendants will be decreed to execute and deliver a deed, and perpetually enjoined from prosecuting the dispossessory action pending in the Court of Common Pleas. If the payment is not made, a permanent injunction will be denied, the preliminary injunction dissolved and the bill dismissed. The costs, in any event, should be imposed on the complainant.

Decree accordingly.